[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDINGS
Joshua Z. is two and one half years old and has lived in foster care since he was three months old. Joshua was adjudicated to be a neglected child on April 18. 1989 and committed to the care and custody of DCYS for a period not to exceed eighteen months. He is now the subject of a petition filed by The Commissioner of the Department of Children and Youth Services ("DCYS") to terminate the parental rights of Burt Z., his father and Sherry Z., his mother.
The termination of parental rights petition, which was filed on December 22, 1989 pursuant to Section 17-43a of the Connecticut General Statutes, alleges the following grounds for termination: (1) Failure to rehabilitate as to both parents, (2) No ongoing parent-child relationship as to mother, (3) Acts of commission or omission resulting in the child being denied the care, guidance or contact necessary for his physical, educational, moral or emotional well being, by both parents. The petition included a request for a waiver of the one year requirement; however, that request was withdrawn on September 13, 1990, the first day of trial, when an amendment to the petition was CT Page 3488 approved by the court.
A trial on the termination of parental rights petition was conducted on September 13 and 14, 1990. All parties were in attendance and were represented by counsel. In addition, mother's court appointed guardian ad litem was present with her during the entire trial.
FACTS:
Evidence offered at trial, interpreted in the light of the prior record in this court concerning Joshua, of which the court has taken judicial notice, permits the finding of the following facts:
Joshua was born in the Worcester Memorial Hospital, Worcester, Massachusetts on April 3, 1988. He was approximately two weeks premature. The hospital placed a hold on Joshua due to concerns that he might be at risk in the care of his parents. Mother was diagnosed at the time as having Borderline Personality Disorder as well as other possible forms of mental illness. Consequently, a case was opened by the Connecticut DCYS when Joshua was one week old. (Exhibit #7).
Joshua was discharged to his home on April 12, 1988 after a service agreement was negotiated with father wherein he agreed to arrange for a supportive baby sitter to be Joshua's primary caretaker during the day. (Exhibit #27). In addition, arrangements were made for home visits with a visiting nurse and mother was referred to out-patient mental health treatment. (Exhibit #7).
Shortly after the birth of Joshua, mother told Burt that he was not the biological father of the child. In May, 1988 she took Joshua to Massachusetts to live with the child's putative father, Paul L.,[1] but returned to reside with Burt within a few weeks. (Testimony of Sharon Buzon and Exhibit #7). DCYS continued to work with mother and entered into a service agreement with her on June 13, 1988.
On July, 21, 1988, when Joshua was approximately 3 months old, mother revealed to her DCYS social worker that she was experiencing suicidal ideation as well as homicidal ideation about killing Joshua. On that same day mother was taken to the emergency room of the Windham Hospital where she was evaluated by a physician who advised mother that she had the choice of voluntarily placing Joshua in foster care and then participating in outpatient treatment at the Natchaug Hospital, or he would commit her to an inpatient program for treatment as he could not permit her to retain custody of the child at that time. Mother chose to voluntarily commit Joshua and he was placed in foster care where he has remained until this date. Unfortunately, Sherry did not follow up with the Natchaug Hospital program. (Testimony of Sharon Buzon and Exhibit #7).
During the first few weeks following placement mother visited with CT Page 3489 Joshua regularly. Thereafter the visits became somewhat more irregular, if not sporadic. Neither the foster parents no DCYS had any contact with mother from August 18 to September 7, 1988. On the later date mother called DCYS but refused to disclose her address. She has consistently refused to disclose her address or whereabouts to DCYS. A neglect and uncared for petition concerning Joshua was filed with the court by DCYS on August 23, 1988.
During the months of September through December, 1988 mother's behavior was frequently bizarre. She complained about the care Joshua was receiving at the foster home even to the point of calling the police to investigate. She reported to DCYS that she found maggots in the child's baby swing, the the nipples to his bottles were green and that the foster parents had cut the child's neck with scissors. All of these allegations were investigated and found to be untrue. (Exhibit #9). Bert filed for divorce in September, 1988, but he never followed through with that action.
Mother and father entered treatment at the Summer Street Treatment Center, which is a licensed and accredited drug, alcohol and psychiatric partial hospital, in October, 1988. Because of their participation in and commitment to treatment the parents were allowed unsupervised visitation with Joshua at their home beginning December 6, 1988.
On April 1, 1989 treatment plans were prepared for Joshua in which the primary goal was to be able to return Joshua to his family in approximately six months. Expectations and the steps necessary to accomplish this goal were set fourth in the plan. Both mother and father participated in a review of the treatment plan and agreed with its provisions. (Exhibits #10, #11, #12, and testimony of Sharon Buzon).
On April 18, 1989 Joshua was adjudicated to be a neglected child and committed to the custody of DCYS for a period not to exceed 18 months At that time the Court stated in its Memorandum of Decision:
 From the very beginning of this child's life he has been at risk and subject to a very unstable and dangerous environment.
 If the mother and father can live up to the terms of the service agreement dated March 12, 1989; and if the mother continues with the treatment which she has agreed to; and if the mother does not suffer any mental or physical problems as a result of the second child; and if after monitoring by DCYS these conditions are satisfied, this Court would expect that the child Joshua would be reintroduced into his family and ultimately DCYS would file a petition to revoke this commitment. (Memorandum of Decision, O'Connell, J.)
On April 21, 1989 mother gave birth to a second son, Adam. Mother participated in a visiting nurse home visit program for Adam and DCYS CT Page 3490 continued to bring Joshua to the parent's home one day per week for visits.
Initially, mother did not appear to experience any of the post-partum depression or psychosis following the birth of Adam that she experienced after the birth of Joshua. She appeared to be taking good care of Adam and there seemed to be a good interaction between mother and Joshua during visits early in May. It is noted, however, that mother was continuing with her therapy at the Summer Street Treatment Center during this time. That was not the case prior to or after the birth of Joshua. However, in late May, 1989 mother's behavior again began to deteriorate.
On May 31, 1989 mother told her visiting nurse, Wendy Lavigne, that she was going back to work as a go-go dancer and that her next door neighbor would be taking care of Adam. She also indicated that she had a fight with her husband, had gotten "plastered" and found herself in bed with a man and another woman in Massachusetts. She also was exhibiting delusional behavior indicating that when she was 15 years old she had a child but that "he killed it" and that he struck a knife inside me. She appeared to be "very stressed out" to Ms. Lavigne. The visiting nurse became concerned and notified DCYS in June after being unable to get in touch with mother at the house. It was later determined that she had taken Adam to live with her in Hartford. On June 20, 1989 mother called the DCYS worker to cancel her visit with Joshua and refused to disclose her whereabouts. When pressed for a phone number or some way to reach her in the event of an emergency with Joshua she became angry and said "you can keep Josh". There was no contact with either parent from June 27th until July 10th when father called and requested a visit with Joshua.
On July 5, 1989 Burt reported to the Connecticut State Police that Sherry had thrown a pot of hot water at him during an argument in his home, hitting and burning him on the chest. He went to the hospital for treatment. (Exhibit 31). During his testimony at trial, Burt claimed that the incident was merely an accident. The court does not find his testimony to be credible with respect this particular incident.
Mother remained in treatment at the Summer Street program until July, 1989. She was discharged from the program in August, 1989 at her own request. Her decision to terminate the program was not shared by her primary therapist, Linda Roberts, who testified that treatment should have been ongoing in order to continue to deal with various issues and mother's needs.
There were no visits with Joshua by father from June 7 until July 14, 1989. Father has visited with the child regularly since that time. Mother did not see Joshua from June 7, 1989 until October 19, 1989. She apparently was in Florida with Adam during most of that time. Mother called DCYS in July asking for a visit but refused to disclose her CT Page 3491 whereabouts. She did not thereafter call DCYS to inquire about Joshua's welfare, and during the entire 18 months that Joshua has been with his current foster family mother has only called them once to inquire about her child.
Father again filed for divorce after mother left for Florida but did nothing about that matter once mother returned on October 13, 1989.
On October 19, 1989 Ms. Buzon explained to mother that she must demonstrate that she was participating in mental health treatment before DCYS would recommend that Joshua be returned home. Mother at first agreed to return to the Summer Street Treatment Center Program, and re-contacted Ms. Roberts regarding re-admission into the program. She was evaluated by the Summer Street staff and it was determined that she required in-patient treatment. That decision was communicated to Sherry but she refused in-patient treatment. On November 3, 1989 she informed DCYS that she would not return to treatment. (Exhibit #19 and testimony of Sharon Buzon). There is no credible or verified evidence that Sherry has participated in any treatment plan or program subsequent to leaving the Summer Street program in July, 1989.
Testimony was received from Ms. Roberts that the Summer Street Treatment Center charges for their services on a sliding scale fee basis. Ms. Roberts testified that although Sherry and Burt were behind on their payments, arrangements were made to adjust their payment schedule to permit them to continue to participate in the program. They were not going to be denied treatment as long as they could and would make some effort to work out a payment schedule. The court accepts this testimony as credible.
On October 19, 1989 both parents entered into a new service agreement with DCYS to permit weekly visits with Joshua. (Exhibit #17). This agreement worked well as both parents visited with Joshua weekly from October 27 through January 19, 1990, with the exception of the period between December 1st through the 14th.
On December 4, 1989 father and mother were involved in a domestic altercation and he was arrested for allegedly hitting her. Burt appeared in the New London Superior court on December 5, 1989. On December 6th the court victim advocate notified DCYS that both parents were on probation, that they each had been arrested five or six times for domestic violence, and that Family Relations would not accept their case for counseling. At that time neither parent was willing to participate in mental health treatment. (Exhibit #6)
On March 13, 1990 Sherry sought and was granted a restraining order against Burt. (Austin, J.). As part of the ex parte application she filed an affidavit with the court in which she spelled out a series of violent, physical altercations between Burt and herself on January 21, CT Page 3492 February 28, and March 12, 1990. These incidents, if true, not only involved Adam, but placed him at risk. If untrue, then mother submitted a false affidavit to the court. (Exhibit #28).
On March 1, 1990 mother and father brought Adam to Dr. Kelly, Adam's pediatrician, because of concern for several bruises. Dr. Kelly discovered several bruises on the arm, chin and leg of the child. The bruises on the arm and leg were in unusual locations for a 10 month old child. Mother told Dr. Kelly that they used a new babysitter for the preceding two weeks and suggested child abuse by the child's babysitter. An investigation by DCYS revealed that the babysitter had not cared for Adam since January. Subsequently, Burt told the DCYS worker that he had lied about the incident to protect Sherry.
On March 24, 1990 mother was arrested by the Connecticut State Police for Disorderly Conduct and Assault on A Police Officer. Sherry was allegedly acting in a violent and disruptive manner and when arrested she bit a police officer on the arm. Adam's whereabouts was unknown at the time and Sherry refused to say where the child was located. He was subsequently found at a neighbor's house where Sherry had left him the day before, supposedly for a short time. Adam was dirty and in need of personal care. A 96 hour hold was placed on Adam by DCYS, and he was subsequently placed with father by DCYS after an order of temporary custody was issued. (Exhibits #3 and #25). Adam has remained in father's care, living with the paternal grandparents, since April, 1990.
Mother's unusual behavior continued during and subsequent to December, 1989. For example, on December 5, 1989 she telephoned Ms. Buzon to say that she had just completed three and on half years of college for computer operations. On March 20, 1990 she called Ms. Buzon to say that there had been a bomb in her car and it blew up while she was in it. On April 27, 1990 she called to say that she had just miscarried twins and that she had a cancerous tumor in her stomach.
Mother failed to appear for her visit with Joshua on March 16, 1990. In a service agreement entered into with DCYS on April 12, 1990, Sherry was to have supervised visit with both Adam and Joshua for one hour twice each month; however, she visited only once in April and May. She claimed to be residing out of state but would not disclose her address or phone number to DCYS. There was no contact at all from mother from May 21 to July 12, 1990 when she called from Florida requesting a visit with Joshua. Mother next visited with Joshua on July 23rd and then on August 31st. (Petitioner's exhibits #29 and #30).
Even when mother did visit with her children at the DCYS office it was observed that she spent her time with Adam and virtually ignored Joshua. Joshua refers to his mother as "that other lady". (Testimony of Sharon Buzon). CT Page 3493
Joshua has been in the care of his current foster mother since December, 1988. Joshua calls his foster parents either Mommy or Ann and Daddy or Robert. He is a happy, outgoing, and well adjusted child. The foster parents have experienced no problems with the child since he has been in their care. His only medical problem is that he has asthma which is controlled with medication. The child calls his father "daddy Burt".
While mother has permission to call the foster parents to ask about Joshua the last time she called was in August, 1989, when she called from Florida. The child does not talk about his mother and his behavior is not changed after visiting with her.
Father always calls before picking Joshua up for his weekend visit. Joshua is happy to go for the visit and happy when he comes back. Father has been visiting with Joshua regularly since April 15, 1990, and has the child with him for most weekends. He testified that he has been unable to meet the expectations of DCYS in finding employment, finding a permanent residence for himself and his children and finding day care for the children. He claimed that he couldn't find work because of too many court appearances.
Burt, by his own admission and the testimony of his father, is in good health, has marketable skills as an autobody repairman and is a qualified insurance adjuster. There is no obvious reason why he has been unable to obtain gainful employment which would have resulted in his being able to secure a suitable residence and day care. He has been living with his parents since April, 1990.
Burt feels that both he and his wife have been treated badly and unfairly by DCYS. He feels that the requirement that he find suitable day care for the children is especially unreasonable. However, he has no one to care for the children if he were to go to work.
The paternal grandfather testified that he and his wife are elderly and cannot care for Joshua. They have been caring for Adam since April and cannot continue to do that indefinitely. Grandfather testified that he does not approve of Burt's marriage to or relationship with Sherry and will not permit her in his home.
Burt reluctantly testified that Sherry is once again pregnant which of course raises all of the concerns which existed at the time of Joshua's commitment. This time, unlike the situation at and subsequent to Adam's birth, mother has stated to DCYS that she will not engage in therapy; thus, the post partum risks are increased.
Finally, Burt has acknowledged during questioning by the court that he deeply loves Sherry, thinks that she is a good mother, and that he did not believe that Sherry would hurt Joshua. He felt that she should have unsupervised visits with the child and should not be kept from CT Page 3494 seeing her children. He thinks that Sherry has been misunderstood and treated unfairly by DCYS. However, Burt testified that he will sever his ties with Sherry and deny her access to the children if that is what will be required in order to be reunited with Joshua.
CLINICAL EVALUATION
Court ordered psychological evaluations of mother, father and Joshua were conducted by Dr. Robert D. Meier, a licensed clinical psychologist who has extensive experience with neglect and termination cases, and who has testified many times before the courts of this state.
Dr. Meier's initial evaluation was done in December, 1988 and January, 1989. He observed that mother's statements made during the interview were inconsistent and indeed in conflict with facts provided to him by DCYS, and often her statements were not logical. For example, she told him that Joshua had been talking since he was three months old. In addition, she admitted to drinking alcohol and using drugs after the birth of Joshua and admitted to taking an overdose of Tylenol in June, 1988. Some of Dr. Meier's findings are reproduced for emphasis. (See Exhibit #1).
 Imaginary threats and real events become merged in her mind and may lead to inappropriate and possible dangerous reactions. This is most likely to occur when Sherry is under the influence of alcohol and drugs, but may not be limited to such situations.
 Strong mood swings are also evident which may lead to lack of control and impulsive behavior . . . . serious mood swings may lead to further suicidal and homicidal thoughts. She has little control over her emotions.
 Although she has shown some apparent attempt to engage in therapy, her history has shown a failure to follow through on treatment options. It is highly questionable whether she will do so now.
In his evaluation of father, Dr. Meier determined that he tended to minimize and lack an understanding of the seriousness of his wife's problems as well as overlook the risks to Joshua. "This raises questions about his ability to protect the child from harm if Sherry were to lose control as she has in the past."
In his conclusions and recommendations following the first evaluation Dr. Meier stated:
 Lack of intensive and continued treatment could lead to a return of previous symptoms and conditions. Statements attributed to Mrs. [Z.] in the documents provided, although denied by Sherry, raise CT Page 3495 serious concerns about the safety of Joshua if she is to regress to her earlier condition.
 Sherry should continue with her individual and marriage counseling, as well as attend AA at least four times per week. If again it is recommended because of her emotional status that she receive inpatient treatment, she should follow such recommendations.
The second evaluation was conducted on March 2nd and 6th, 1990. During this interview mother admitted that she had been afraid that she was going to kill Joshua and admitted a suicide attempt. She denied using alcohol or drugs and indicated that she was going to AA seven days per week, although it made her worse because the people in the program went out to drink after the meetings. She expressed great anger and hostility towards the DCYS social worker and the foster parents. Dr. Meier found that Sherry had limited insight into her problems and tended to project blame onto others for her difficulties. She seemed to have only limited understanding of the developmental needs of her children, although her behavior with Adam was appropriate during the interview.
The evaluation of father revealed that father blamed many of the current problems on his perception that Sherry and the social worker do not get along. He feels that everyone is against Sherry and that she has been unfairly accused of some things.
Dr. Meier's conclusions following the second evaluation (Exhibit #2) and his testimony before this court indicate that mother is suffering from Bi-polar disorder and a borderline personality disorder. These disorders are characterized by lack of consistency, a lack of judgement, a lack of impulse control, mood swings, inappropriate social behavior and a lack of goals resulting in a failure of follow up treatment to correct these problems. In addition, he found instances of delusional behavior with respect to mother. While he found some improvement in mother's behavioral and emotional situation, there were no significant differences in patterns of behavior between the two evaluations.
In his second evaluation of father Dr. Meier concluded that while father has the judgement and ability to care for Joshua he may never be assertive enough with mother to be able to protect and care for the children when they are living together. Father appears to be able place the needs of Joshua over his own emotional need for the mother. Dr. Meier recommended against returning the child to mother's care. He testified that Joshua should not be left alone with mother, and he recommended against returning Joshua to father if mother, and he recommended against returning Joshua to father if mother were to live with father, unless she followed through with all of the recommendations concerning treatment. He testified that there are risks to the child directly from mother and as a result of the violence within the home between mother and father. CT Page 3496
Dr. Meier testified that in his opinion, based upon professional studies, there is a detrimental effect upon children under the age of three years after remaining in foster care for more than one year and for children over the age of three years at the time of placement after being placed in foster care for two years. Joshua, at age two and one half years, is well over these standards. Dr. Meier testified that a decision concerning permanent placement is becoming critical for Joshua and that it would be detrimental to Joshua to wait any longer to provide him with a permanent home. It is not likely that mother will be capable of caring for Joshua within a reasonable time and it is not likely that father will be able to adequately care for and protect Joshua if father is living with mother.
ADJUDICATION: as of 9-13-90, the date the petition was last amended.
The respondent mother has made reference in her brief to the "standard" of requiring that a child be suffering from serious illness or injury or be in immediate danger of physical injury before said child may be removed from the custody of his or her parent. Counsel argues that Constitutionally this "standard" should be no less for an order of temporary custody or an adjudication of neglect than for a termination of parental rights, and argues that the court should apply said "standard" to the instant case. Counsel, however, has misapplied this term. What counsel refers to as "standards" are actually the grounds which must be proven by an established standard. In the case of a hearing on a motion for and order of temporary custody the ground of serious illness or injury or imminent danger of physical injury must be proven by the standard of a fair preponderance of the evidence. (Emphasis added). In the case of a petition to terminate parental rights the greater standard of clear and convincing evidence is required, as counsel argues it should be. While the grounds for an order of temporary custody, for an adjudication of neglect, and for termination of parental rights may overlap, each is independently established by statute. An adjudication of neglect and/or the termination of parental rights does not require a finding that the child has suffered serious illness or injury, nor does it require a finding that there be a risk of physical harm to the child should he be returned to his parent.
ACTS OF COMMISSION OR OMISSION:
In order to terminate parental rights on the ground of acts of commission or omission under Section 17-43a(b)(3) the court must clearly and convincingly find that the child was denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the parent or parents. Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267
(1984). CT Page 3497
The court finds that the petitioner has not proven by clear and convincing evidence that Joshua has been deprived of any care guidance or control necessary for his physical, educational, moral or emotional well-being by the acts of commission or omission of either parent. (Emphasis added.) He has been living in a loving, caring and nurturing environment with his foster family for more than two years where his needs have been adequately satisfied. Having been within the security of foster care, he has not been affected by instances of domestic violence between mother and father. There has been no clear and convincing evidence presented to the court that Joshua's emotional well-being has suffered as the result of being in placement with a loving foster family. Indeed, Joshua appears to be a happy, outgoing, well-adjusted and normal child who has never been a behavioral problem for his foster mother.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
 ". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child."
The court finds from the evidence clear and convincing proof that there is no parent-child relationship in existence between mother and Joshua and further finds that this situation has existed for more than one year. Sherry has not really been involved in Joshua's life since he was first placed with DCYS in July, 1988, at the age of three months. During the past two years mother has not met nor been concerned with Joshua's physical, emotional, moral and educational needs and she has not contributed to the development of the child's physical, educational or moral upbringing.
Joshua is two and one half years old and has been in foster care for all but the first three months of his life. Mother has not visited with her son and a continuing or regular basis, and even when she did visit with him at the DCYS office she paid little attention to Joshua or his needs. Even prior to Joshua's adjudication as a neglected child mother spent long periods of time away from him. Mother has not remained in contact or communicate with the child's foster mother to inquire about her son's development, needs or well-being. Clearly, that is not the behavior of a parent who loves and cares for her child.
Joshua refers to his mother as "that other lady" while he refers to his foster parents as "mommy" and "daddy". He does not appear to recognize Sherry as his mother. CT Page 3498
The fact that there has been some contact between parent and child subsequent to the commitment in April, 1989, ". . . does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year". In re Juvenile Appeal, (Anonymous).181 Conn. 638, 646 (1980).
Even though no parent-child relationship exists, that alone is not grounds to terminate a parent's rights. The court must also find by clear and convincing proof that to permit further time to establish such relationship would be detrimental to the best interest of the child.
It is not in the child's best interest to remain in a state of uncertainty as to his future. He needs a permanent home and permanent caregivers. He needs to know who he is and to whom and what family he belongs. That is not going to occur as long if Sherry is permitted to continue her sporadic, minimal involvement in the child's life. According to Dr. Meier, Joshua already falls outside of the maximum time a child his age should remain in placement and that a decision regarding placement is becoming critical. In addition, the clinical evidence indicated, and the court finds, that Joshua would be at risk if placed or even left with mother unless she follows through with the mental health treatment she has rejected.
Mother has done little to improve her relationship with Joshua or her personal circumstances over the past year, and it is not likely, given her attitude, her behavior, and her failure to follow through on recommendations designed to effect a reunification, that this will improve within the reasonably foreseeable future.
The court clearly and convincingly finds that it would be detrimental to the best interest of this child to require him to wait any longer for a mother, who has expressed and demonstrated so little interest in him for most of his life, to decide whether she wants to invest the time and effort in attempting to establish a meaningful relationship with her son.
FAILURE TO REHABILITATE:
Section 17-43a(b)(2) of the General Statutes provides for the termination of parental rights in the situation where a parent of a child who has previously been adjudicated as being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time said parent could assume a responsible position in the life of the child, considering the age and the needs of said child. The phrase "`personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent.'" In Re Rayna M.,13 Conn. App. 23, 32 (1987); In Re. Migdalia M., 6 Conn. App. 194, 203
(1986). CT Page 3499
FATHER: While the evidence in this case would support the argument that father has failed to fully rehabilitate in that he has not secured full time employment, or a suitable residence, or day care for Joshua, his increased involvement and improved relationship with the child is undeniable.
Joshua has spent every weekend since April, 1990 with his father, and there is no evidence to suggest that his care during those weekends has been anything other than acceptable, In addition, there exists a strong parent-child relationship between Joshua and his father.
While the court has continuing concerns about father's relationship with Sherry and the potential effect of that relationship upon the child, it is noted that father has testified that if the only way he can have Joshua returned to him is by denying mother access to the child he will do so. Burt has been living with his parents and apart from Sherry since at least April, and it would appear that father has not compromised the child's safety or well-being during the time he has had the child with him over the past five months.
The court is mindful of Dr. Meier's opinion that Joshua has already been too long in foster care; however, under the facts and circumstances of this particular case the court is not persuaded by clear and convincing evidence that father will be unable to assume a responsible role or position in the life of this child within a reasonable period of time.
The court finds that the petitioner has not proven by clear and convincing evidence that it is in the best interest of the child to terminate his father's parental rights at this time.
MOTHER: Sherry is no closer to being able to care for Joshua today than she was when he was adjudicated to be a neglected child and committed to DCYS some seventeen months ago. There has been nothing in mother's behavior over the past 17 months which provides the court with any indication that she will be capable of caring for Joshua in the foreseeable future: in fact, quite the contrary is true. There is clear and convincing evidence that her interest in and relationship with Joshua had deteriorated to the point where there is no ongoing parent-child relationship. Mother appears to have little or no interest in the child or his needs. She has not fulfilled the expectations of the court as articulated in its Memorandum of Decision, she has not cooperated with DCYS, she has not visited regularly with Joshua, she has not continued with mental health therapy, which she clearly needs, and she has continued to be involved in instances of domestic violence.
Dr. Meier determined that it would not be in Joshua's best interest to return him to his mother, or even leave him alone with her, unless she followed through with treatment and therapy. Mother has indicated CT Page 3500 that she does not intend to continue with therapy. Dr. Meier further indicated that Joshua is at direct risk from mother and that she is unlikely to be able to care for him the reasonably foreseeable future.
The court agrees with Dr. Meier's assessment and finds it clearly and convincingly proven from the weight and sufficiency of the evidence that for more than one year mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the life of this child, and that because of her mental illness and prior personal history it is most unlikely that she will be able to care for this child without extensive support services, which she is unwilling to accept, in the foreseeable future. See: In re Juvenile Appeal (84-3), 1 Conn. App. 463,478 (1984).
The court's six required findings pursuant to Sect. 17-43a, and In Re Shavoughn K., 13 Conn. App. 91, 98 (1987), are as follows.
 (1) Mother was referred to and or received services from the Willimantic United Social And Mental Health Services; mental health counseling and therapy from the Summer Street program; the Natchaug Hospital mental health program; the Visiting Nurses Association and parents aid program; East Conn. early intervention and parent education program; and a couples counseling program. In addition, DCYS entered into at least four service agreements between June 13, 1988 and April 12, 1990. (Exhibits #11, #15, #17, #19, #21, #26, #27, #30).
 (2) Mother participated in psychological evaluations as ordered by the court.
 (3) The child has no emotional ties with mother. He calls her "That other lady". The child's emotional ties appear to be with the foster mother and with his father.
 (4) Joshua is two and one half years old with a date of birth of April 3, 1988.
 (5) Mother has made no serious efforts to alter her conduct, circumstances or conditions to make it in the best interest of Joshua to be able to return to her care within the foreseeable future. She has terminated her mental health therapy, she has not visited with the child on a regular basis, she has not kept in contact with the child's foster mother concerning the welfare of the child, and she has been uncooperative with DCYS. She even refuses to let DCYS know where she is living or how to contact her in the event of an emergency involving Joshua.
 (6) Mother has not been prevented from maintaining a meaningful relationship with Joshua by the unreasonable act or conduct of CT Page 3501 any other person or as the result of economic circumstances.
DISPOSITION:
The court, having found by clear and convincing evidence that there is no ongoing parent-child relationship between mother and child, and that mother has failed to rehabilitate, further finds that the petitioner has proven by clear and convincing evidence that it is in the best interest of Joshua to terminate the parental rights of his mother so that he may be raised in a permanent, safe, secure, and nurturing environment. The court has found that Joshua would not be safe in mother's care and further finds it to be in his best interest to be kept from her while at the same time striving for permanency, hopefully with his father. It is ORDERED that the parental rights of Sherry Z. in and to Joshua Z. are hereby terminated.
Dr. Meier has indicated that a decision regarding placement for Joshua is becoming critical: the court agrees. However, it is the judgement of the court, based upon the totality of the evidence and circumstances, that absent interference by the child's mother, a permanent placement with the father is still possible, and that this would be in the best interest of the child. Therefore, the critical decision that is being made by the court today is to allow additional time and opportunity for father to make a home for Joshua and assume a responsible role or position in the life of this child.
The Petition to terminate the parental rights of Burt Z. is dismissed as the petitioner has not proven by clear and convincing evidence any of the grounds alleged for terminating the parental rights of father, and has not proven by clear and convincing evidence that it would be in the best interest of the child to terminate his father's parental rights at this time.
The child, having been adjudicated neglected, remains committed to the custody of the Commissioner of the Department of Children and Youth Services pursuant to the previous orders of this court.
Terence A. Sullivan, Judge